IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACUITY BRANDS LIGHTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-2207 (MN) |
| | ) | |
| ULTRAVISION TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM ORDER</u>

At Wilmington this 28th day of July 2021:

IT IS HEREBY ORDERED that the claim terms of U.S. Patents Nos. 8,870,410 ("the '410 Patent"), 8,870,413 ("the '413 Patent"), 9,734,738 ("the '738 Patent"), 9,947,248 ("the '248 Patent"), and 10,223,946 ("the '946 Patent") (collectively, "the Patents-in-Suit") with agreed-upon constructions (*see* D.I. 92-1), are construed as follows:

1.  "acrylic material" / "acrylic material substrate" means "material containing primarily acrylates" / "substrate containing primarily acrylates" ('410 Patent, cl. 15; '413 Patent, cl. 4, 10, 12);

2.  The preambles "An optics panel for use in a light emitting diode (LED) lighting assembly comprising" / "An optics panel for use in a light emitting diode (LED) lighting assembly for illuminating a billboard that has a display surface extending between outer edges of the billboard, the optics panel comprising" are limiting ('410 Patent, cl. 1, 10, 15; '413 Patent, cl. 1, 5, 11);

3.  "substantially transparent" means "transparent" ('410 Patent, cl. 1; '413 Patent, cl. 5, 11);

4.  "predetermined bounded area" means "area determined by the dimensions of the [display surface]" ('410 Patent, cl. 1);

5.  "substantially the entire display surface" shall have its plain and ordinary meaning of "the entire display surface" ('410 Patent, cl. 1, 15);

6.      "optics panel" shall have its plain and ordinary meaning, and the optics panels of independent claims 1 and 15 of the '410 Patent and claims 1, 5, and 11 of the '413 Patent comprise the respective elements of those claims ('410 Patent, cl. 1, 10, 11, 15; '413 Patent, cl. 1, 5, 11); and

7.      "wherein each lens is disposed over only one associated LED" / "each optical element disposed over only one associated LED" / "each optical element is disposed over only one associated LED" / "each optical element overlies only one associated LED" / "each optical element overlies only one associated LED" / "each convex optical element overlying an associated one of the LEDs" / "each optical element . . . overlies a respective one of the LEDs" shall have their plain and ordinary meaning of "each [lens/optical element/convex optical element] is disposed over only one LED" ('410 Patent, cl. 10; '413 Patent, cl. 1, 5, 11; '738 Patent, cl. 1, 10; '248 Patent, cl. 1, 10; '946 Patent, cl. 29).

Further, as announced at the hearing on July 21, 2021, IT IS HEREBY ORDERED that the

following disputed claim terms of the Patents-in-Suit are construed as follows:

1.      "substantially uniform / substantially equal level of illumination / a uniformity . . . remains substantially unchanged / the uniformity of light . . . remains substantially the same / a uniformity of light . . . remains substantially the same / a uniformity of light . . . remains substantially unchanged" mean "a level of illumination that does not create unnoticeable unevenness in the overall illumination ('410 Patent, cl. 1, 10, 15; '248 Patent, cl. 3; '738 Patent, cl. 11, 13; '946 Patent, cl. 12);

2.      "lens element" means "a geometrically distinct part of a lens" ('410 Patent cl. 1, 16, 22; '413 Patent cl. 3, 7, 13);

3.      "convex optical element" means "a lens that curves or bulges outward" ('946 Patent cl. 1, 21, 29);

4.      "display surface" means "sign surface" ('410 Patent, cl. 1, 7, 10, 12, 14, 15, 19, 20, 21, 25, 26; '413 Patent, cl. 1, 2, 4, 5, 6, 10, 11, 12, 16, 17);

5.      "area" / "substantially rectangular area" mean "area of a sign" / "substantially rectangular area of a sign" ('946 Patent, cl. 1, 21, 24, 29; '248 Patent, cl. 1, 10, 11, 12);

6.      "configured to" / "configured so" means "designed to" / "designed so" ('410 Patent, claims 1, 10, 15; '413 Patent, claims 1, 5, 11; '738 Patent, claims 1, 10, 11, 12, 14; '248 Patent, claims 1, 3, 10, 11; '946 Patent, claims 1, 12, 21, 24, 29); and

2

7.    "[average illumination to minimum illumination uniformity ratio] is 3:1 / [a ratio of the average illumination from that LED across the entire display surface to the minimum illumination from that LED at any point on the display surface] is 3:1 / [a ratio of the average illumination from each of the LEDs across the entire display surface to the minimum illumination at any point on the display surface from each of the LEDs] is 3:1 / [a ratio of the average illumination from that LED across the entire display surface to the minimum illumination from that LED at any point on the display surface] is 3:1 / [ratio of the average illumination from each LED across the entire display surface to the minimum illumination from that LED at any point on the display surface] [[to]] is 3:1" mean "has a ratio of 3:1" ('410 Patent, cl. 5, 14, 20; '413 Patent, cl. 1, 5, 11).

The parties briefed the issues, (*see* D.I. 93), and submitted a Joint Claim Construction Chart containing intrinsic evidence, (*see* D.I. 92-1).  The Court carefully reviewed all submissions in connection with the parties' contentions regarding the disputed claim terms, heard oral argument, (*see* D.I. 100), and applied the following legal standards in reaching its decision.

## I.    LEGAL STANDARDS

### A.    Claim Construction

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015).  "[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted).  Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered.  *Id.* at 1314.  "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent."  *Id.* at 1321 (internal quotation marks omitted).

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.  "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history,

including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

    B.    Indefiniteness

    Section 112 of the Patent Act requires a patent applicant to "particularly point out and distinctly claim the subject matter" regarded as the applicant's invention. 35 U.S.C. § 112 ¶ 2. "The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.* competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002) (citing *Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 28-29 (1997)). Put another way, "[a] patent holder should know what he owns, and the public should know what he does not." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 731 (2002).

A patent claim is indefinite if, "viewed in light of the specification and prosecution history, [it fails to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). A claim may be indefinite if the patent does not convey with reasonable certainty how to measure a claimed feature. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015). But "[i]f such an understanding of how to measure the claimed [feature] was within the scope of knowledge possessed by one of ordinary skill in the art, there is no requirement for the specification to identify a particular measurement technique." *Ethicon Endo–Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1319 (Fed. Cir. 2015).

Like claim construction, definiteness is a question of law, but the Court must sometimes render factual findings based on extrinsic evidence to resolve the ultimate issue of definiteness. *See, e.g.*, *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017); *see also Teva*, 135 S. Ct. at 842-43. "Any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003); *see also Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008).

## II.    THE COURT'S RULING

The Court's rulings regarding the disputed claim terms of the Patents-in-Suit were announced from the bench at the conclusion of the hearing as follows:

> . . . Thank you for the arguments earlier today. At issue we have five patents,[1] and seven disputed claim terms.

---

1       All five of the patents in suit share a specification, although the '410 Patent and '413 Patent are based on a different provisional application than the'738 Patent, '248 Patent, and '946 Patent.

I am prepared to rule on each of the disputes.  I will not be issuing a written opinion, but I will issue an order stating my rulings.  I want to emphasize before I announce my decisions that although I am not issuing a written opinion, we have followed a full and thorough process before making the decisions I am about to state.  I have reviewed the patents in dispute.  I have also reviewed the documents from the Eastern District of Texas action, the dictionary definitions, the excerpts of treatises, the expert declarations, and other documents included in the joint appendix.  There was full briefing on each of the disputed terms.  And there has been argument here today.  All of that has been carefully considered.

As to my rulings, I am not going to read into the record my understanding of claim construction law and indefiniteness generally.  I have a legal standard section that I have included in earlier opinions, including recently in *Ferring v. Fresenius*, C.A. No. 20-431.  I incorporate that law and adopt it into my ruling today and will also set it out in the order that I issue.

As to the person of ordinary skill in the art, the parties have suggested differing definitions.  But no party suggests that the differences are relevant to the issues currently before me.

Now the disputed terms.  I am going to refer to the original numbering in the claim construction brief, even though several of those terms are no longer disputed.

The first term comprises several phrases, which the parties have collectively deemed "the Uniformity Limitations."[2]  All of the phrases include the word "substantially" and the parties agree that all of the terms should be construed the same.  Ultravision argues that the Uniformity Limitations should be construed as "level of illumination that does not create noticeable unevenness in the overall illumination, such as hot spots or dead spots."  Acuity argues that the Uniformity Limitations are indefinite and does not propose an alternative construction.

The crux of the dispute is whether the word "substantially," used here as a word of degree, renders this term and the relevant claims

---

[2]     Those phrases are: "substantially uniform / substantially equal level of illumination / a uniformity . . . remains substantially unchanged / the uniformity of light . . . remains substantially the same / a uniformity of light . . . remains substantially the same / a uniformity of light . . . remains substantially unchanged" in claims 1, 10, and 15 of the '410 Patent, claim 3 of the '248 Patent, claims 11 and 13 of the '738 Patent, and claim 12 of the '946 Patent.

indefinite.  Here, I agree with Ultravision that it is not indefinite and will construe this term as "level of illumination that does not create unnoticeable unevenness in the overall illumination."

For a claim to be held invalid for indefiniteness, there must be clear and convincing evidence.[3]  Acuity has not met this burden.

In *Biosig Instruments, Inc. v. Nautilus, Inc.*, the Federal Circuit instructed that "[w]hen a 'word of degree' is used, the court must determine whether the patent provides 'some standard for measuring that degree'" and that "[c]laim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention."[4]

Here, the specification indicates that the invention serves to "minimiz[e] any noticeable unevenness in the overall illumination"[5] and gives examples of undesirable unevenness, such as "hot spots" and "dead spots."[6]  This suggests that the purpose of the invention is to produce a "substantially uniform" appearance without deviations readily apparent to the normal human eye.  The Federal Circuit recognized in *Sonic Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1378 (Fed. Cir. 2017) that, unlike terms that turn on whether something is aesthetically pleasing or otherwise subjective, "what can be seen by the normal human eye . . . provides an objective baseline through which to interpret the claims."  And courts have held that the normal human eye can detect when something is, for example, "substantially horizontal"[7] or "substantially flattened,"[8] such that the use of "substantially" does not render those terms indefinite.  Indeed, the Federal Circuit found that the phrase "substantially uniform," albeit in a different context, was not indefinite because "'substantially' is a descriptive term

---

[3]   *See Nautilus*, 572 U.S. at 912 n.10 (citing *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 95 (2011))).

[4]   *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015).

[5]   ('410 Patent col. 6 ll. 21–23).

[6]   (*See* '410 Patent col. 2 ll. 55–58, col. 5 ll. 33–35).

[7]   *Total Control Sports, Inc. v. Precision Impact*, No. 17-CV-09281, 2019 WL 6464002, at *9 (N.D. Ill. Dec. 2, 2019) ("The normal human eye can perceive when an object travels 'substantially horizontal,' and thus a person having ordinary skill has an objective baseline to interpret the claims.").

[8]   *Kluhsman Mach., Inc. v. Dino Paoli SRL*, No. 5:19-CV-00020, 2020 WL 4227470, at *6 (W.D.N.C. July 23, 2020) (giving "substantially flattened" the "plain and ordinary meaning of substantially but not necessarily completely flat.").

commonly used in patent claims to 'avoid a strict numerical boundary to the specified parameter.'"[9]

Therefore, given that the word "substantially" suggests that the lighting must be uniform as detected by the normal human eye, I will adopt Ultravision's proposed construction of "level of illumination that does not create noticeable unevenness in the overall illumination."

The second term is "lens element."[10] Ultravision contends that this term should be given its plain and ordinary meaning, which it argues is "an element of a lens," or alternatively, "a geometrically distinct volume of an optical element" and agreed today that we could use part instead of volume. Acuity proposes that the term be construed as "a lens with two or more optical surfaces."

I have some doubts that there is a significant dispute about the parties' positions. But to the extent there is, I agree with Ultravision and will give the term its plain and ordinary meaning of "a geometrically distinct part of a lens" rather than require distinct surfaces.

That is consistent with the specification, which to the extent it refers to a lens element does so in connection with Figures 8A through J. These illustrate and identify different geometric shapes (such as 820, 822, 824 and 826) rather than surfaces as being lens elements.

The third term is "convex optical element."[11] Ultravision argues that this term should be given its plain and ordinary meaning, which it proposes is "an optical element that is convex." Acuity asserts that the term should be construed as "a radially symmetric hemispherical outer surface."

The crux of the dispute is whether Acuity is correct in asserting that "convex" means perfectly hemispherical. Acuity points to Figure 5A in support of its position, arguing that "the lenses of Fig. 5A appear to be portions of a sphere with radial symmetry, *i.e.*, convex."[12] But nothing in the specification or claims confirms that the lenses shown in Figure 5A are perfectly hemispherical.

---

[9]   *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001).

[10]   This term is in claims 1, 16, and 22 of the '410 Patent and claims 3, 7, and 13 of the '413 Patent.

[11]   This term is in claims 1, 21, and 29 of the '946 Patent.

[12]   (D.I. 93 at 30).

Furthermore, that figure depicts merely one embodiment, meaning it would be inappropriate to read that limitation into the claims.[13]

Acuity also argues that Ultravision's expert supports Acuity's construction.[14]  I disagree.  In his declaration, Ultravision's expert opines that a POSA "would understand a convex shape to bulge outwards, as opposed [to] a recessed (*i.e.*, concave) shape, without the need for further clarification."[15]  This says nothing about whether the shape must be radially symmetric and hemispherical.

I agree with Acuity, however, that using the word "convex" in the construction as Ultravision proposes is not helpful.  The parties each cite definitions of convex.  Ultravision's definitions include "curved or swelling out,"[16] "curving or bulging outward"[17] and "having a surface that is curved or rounded outward."[18]  Acuity pointed to a definition defining convex as "[c]urving outward, like the outer boundary of a circle or sphere."[19]  Both parties agree that a "convex" shape is one that "bulges outwards" but there is nothing in the definitions or the intrinsic record to support Acuity's proposed limitation that a convex shape must be perfectly hemispherical, rather than some other convex or bulging shape.

Consistent with the plain and ordinary meaning of convex, I will construe "convex optical element" as "a lens that curves or bulges outward."

I am going to address the fourth and fifth terms together as the parties seem to agree that the analysis underlying the construction of the two terms is the same.  The fourth term is "display surface."[20]  Ultravision asserts that this term should be given its plain and ordinary meaning, which it contends is "surface to be displayed

---

13      *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

14      (D.I. 93 at 30).

15      (D.I. 85, Ex. 7 ¶ 65).

16      (*Id.* at Ex. 13).

17      (*Id.* at Ex. 14).

18      (*Id.* at Ex. 15).

19      (*Id.* at Ex. 15).

20      This term is in claims 1, 10, 14, 15, and 20 of the '410 Patent, claims 1, 4, 5, 10, 11, and 12 of the '413 Patent, and claims 1, 3, 10, 11, 12, 13, and 17 of the '738 Patent.

using illumination."   Acuity argues that this term should be construed as "sign surface."

The fifth term is "area" / "substantially rectangular area."[21] Ultravision argues that no construction is necessary and that the term should be given its plain and ordinary meaning.  Acuity contends that the term should be construed to mean "sign" / "rectangular sign."

The dispute for these terms centers on whether the "display surface" and the "area" claimed are limited to signs.  Here, I agree with Acuity and will construe "display surface" to mean "sign surface" and "area" to mean "area of a sign."

The Federal Circuit has repeatedly stated, in cases such as *Continental Circuits LLC v. Intel Corp.* that "the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'"[22] Where, however, a patent repeatedly and consistently characterizes a claim term in a particular way, it is appropriate to construe the term in that way.[23]  Here, in column 2 at lines 6 through 9, the specification explains that "[a]lthough billboards are used herein for purposes of example, it is understood that *the present disclosure may be applied to lighting for any type of sign* that is externally illuminated."[24]   And the Technical Field in the shared specification notes that "[t]he following disclosure relates to lighting systems and, more particularly, to lighting systems using light emitting diodes to externally illuminate signs."  I find that these statements in the specification constitute expressions of manifest restriction intended to limit the invention to lighting of signs.

Therefore, I will construe "display surface" as "sign surface."

As to area, I will give the term its plain and ordinary meaning, but will limit to the area to that of a sign because as I have already determined with respect to display surface, the invention as claimed

---

[21]    These terms are in claims 1, 21, 24, and 29 of the '946 Patent and claims 1, 10, 11, and 12 of the '248 Patent.

[22]    *Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir.).

[23]    *Wisconsin Alumni Rsch. Found. v. Apple Inc.*, 905 F.3d 1341, 1351 (Fed. Cir. 2018).

[24]    ('410 Patent col. 2 ll. 6–9 (emphasis added)).

is restricted to signs.  And indeed, when the term "area" is used in the specification, it is referencing the area of a surface.[25]

The sixth term is "configured to / configured so."[26]  Ultravision asserts that this term should be construed as "capable of."  Acuity argues that this term should be construed as "designed to / designed so."

The crux of the dispute centers on whether "configured" is simply the hypothetical ability to do something.  Here, I agree with Acuity and will construed the term as "designed to / designed so."

The patent specification uses "configured" interchangeably with "designed."  The claim term refers to lenses or a substrate containing lenses being "configured to" direct light from each LED onto the entire display surface.[27]  The specification confirms that "the optical elements 514 are configured so that the light emitted from each LED 416 is projected onto the entire surface"[28] and then notes that "by *designing* the lens in such a manner, when all LEDs are operating, the light [from] the collective thereof will illuminate the surface."[29]  The specification also explains that the lens structures located on the substrate are "designed to 'direct' the light from an edge of the surface to cover the entire surface."[30]  These examples show that the specification uses "configured" to mean "designed" to do something.  That meaning is clear when the specification notes that "the optics panel 206 may be *configured specifically* for the light panel 204 and the surface."[31]   Importing Ultravision's

---

25    ('410 Patent at [57] (describing "a surface having a predetermined bounded area. Light from each of the LEDs is directed by the transparent substrate across the entire area of the surface"); '410 Patent col. 1 ll. 24–27 (using same language)).

26    These terms are in claims 1, 10, and 15 of the '410 Patent, claims 1, 5, and 11 of the '413 Patent, claims 1, 10, 11, 12, and 14 of the '738 Patent, claims 1, 3, 10, and 11 of the '248 Patent, and claims 1, 12, 21, 24, and 29 of the '946 Patent.

27    (*See* '410 Patent col. 8 ll. 37–40 ("a substantially transparent substrate comprising a plurality of optical elements . . . configured to direct light from each of the plurality of LEDs . . . onto a display surface"), col. 9 ll. 11–13 ("a plurality of lenses, wherein each lens . . . is configured to direct light from that LED toward the display surface"), col. 9 ll. 41–47 ("an acrylic material substrate comprising a plurality of optical elements [which are] configured to direct light from each of the plurality of LEDs . . . onto a display surface")).

28    ('410 Patent col. 5 ll. 4–6).

29    ('410 Patent col. 5 ll. 16–18 (emphasis added)).

30    ('410 Patent col. 5 ll. 37–38).

31    ('410 Patent col. 6 ll. 32–34 (emphasis added)).

12

proposed construction of "capable," this phrase becomes nonsensical. Acuity's proposed construction of "designed" is not only more meaningful, it is also confirmed by the specification, which gives an example in which "the panel 500 of Fig. 5 may be *specifically designed* for use with the PCB 402 of Fig. 4."[32] Therefore, the specification supports Acuity's proposed construction.

In *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, the Federal Circuit indicated that "configured to" has a narrower definition than "having the capacity to" or "capable of."[33] And district courts have relied on *Aspex Eyewear* to construe "configured to" as "programmed to,"[34] which implies intentional design rather than mere capacity.

Therefore, I will construe this term as "designed to" / "designed so." Today during the argument, Acuity stated that it is not arguing that the "designed to" construction depends on the subjective intent of the people designing the product. I will hold Acuity to that.

The eighth term comprises several phrases, collectively deemed "the 3:1 Ratio Limitations."[35] These phrases refer to the ratio between the average illumination across the display surface and the minimum illumination at any point on the display surface. Ultravision contends that this term should be construed as "achieves 3:1." Acuity argues that the term should be given its plain and ordinary meaning, which it asserts is "has a ratio of 3:1."

---

[32]   ('410 Patent col. 6 ll. 35–37 (emphasis added)).

[33]   *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012).

[34]   *See, e.g., Wapp Tech Ltd. P'ship v. Seattle Spinco, Inc.*, No. 4:18-CV-469, 2020 WL 1983087, at *20 (E.D. Tex. Apr. 27, 2020); *Radware Ltd. v. A10 Networks, Inc.*, No. C-13-02024-RMW, 2014 WL 1572644, at *12 (N.D. Cal. Apr. 18, 2014).

[35]   Those phrases are: "[average illumination to minimum illumination uniformity ratio] is 3:1 / [a ratio of the average illumination from that LED across the entire display surface to the minimum illumination from that LED at any point on the display surface] is 3:1 / [a ratio of the average illumination from each of the LEDs across the entire display surface to the minimum illumination at any point on the display surface from each of the LEDs] is 3:1 / [a ratio of the average illumination from that LED across the entire display surface to the minimum illumination from that LED at any point on the display surface] is 3:1 / [ratio of the average illumination from each LED across the entire display surface to the minimum illumination from that LED at any point on the display surface] [[to]] is 3:1" in claims 5, 14, and 20 of the '410 Patent and claims 1, 5, and 11 of the '413 Patent.

The crux of the dispute is whether a ratio better than 3:1 falls within the scope of the claim term.  Here, I agree with Acuity and will give the term its plain and ordinary meaning of "has a ratio of 3:1."

First, the claims themselves state that the ratio of the average illumination to the minimum illumination "is 3:1," which suggests that the ratio must be exact rather than approximate.

Ultravision argues that the specification supports its broader construction because it describes "evenly" as "illumination with a uniformity that achieves a 3:1 ratio of the average to the minimum."[36]  This description does not, however, clarify whether ratios better than 3:1 are permissible.   Accepting Ultravision's suggestion that the word *achieves* necessarily includes better illumination ratios would render this language in the specification broader than the plain language of the claims.

Because the five Patents-in-Suit share a common specification, language used in the other patents may inform our analysis.[37]  Here, claim language in the '248 Patent supports the Court's construction.  In the '248 Patent, the patentee explicitly claimed "a uniformity that achieves at most a 3:1 ratio."[38]  Thus, the patentee could also have claimed "at most a 3:1 ratio" during prosecution of the '410 Patent and '413 Patent, yet chose not to do so.

Therefore, I will give this term its plain and ordinary meaning of "is 3:1."


The Honorable Maryellen Noreika
United States District Judge

---

36      ('410 Patent col. 5 ll. 14–16).

37      *See NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).

38      (*See, e.g.*, '248 Patent col. 11 ll. 50–51).